UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PHILIPS NORTH AMERICA, LLC, et al.,

Plaintiffs,

v.

SUMMIT IMAGING INC., et al.,

Defendants.

CASE NO. C19-1745JLR

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

Before the court is Plaintiffs Philips North America, LLC, Koninklijke Philips N.V., and Philips India, Ltd.'s (collectively, "Philips") motion to dismiss Defendants Summit Imaging Inc. and Lawrence R. Nguyen's (collectively, "Summit") counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. (Dkt. # 50).) Summit opposes Philips's motion. (Resp. (Dkt. # 53).) Philips filed a reply. (Reply (Dkt. # 54).) The court granted Summit's motion to file a surreply. (Order Granting Surreply (Dkt. # 65); Surreply (Dkt. # 70).) Having considered the motion, the parties' submissions

1   regarding the motion, the relevant portions of the record, and the applicable law,[1] the

2   court GRANTS in part and DENIES in part Philips's motion to dismiss.

## I.   BACKGROUND

**A.   Factual Background**

5       Summit "provides maintenance, repair and related services for medical equipment,

6   including ultrasound and mammography equipment." (Counterclaims (Dkt. # 41 at

7   30-48) ¶ 11.) Summit is an "independent service organization," or "ISO," that specializes

8   in servicing medical equipment manufactured and sold by other companies. (*Id.* ¶ 12.)

9   Summit's customers include healthcare facilities (such as hospitals) and other entities in

10  the United States and Canada that own and operate medical equipment, including

11  ultrasound equipment. (*Id.* ¶ 14.) Summit alleges that its customers "highly value and

12  prefer" Summit because of its "ability to minimize costly downtimes of vital medical

13  equipment," its "top-quality customer service and diagnostic and repair services," and

14  "the lower cost of Summit's services relative to its original equipment manufacturer

15  ('OEM') competitors in the service market." (*Id.* ¶¶15-17.)

16      One type of medical equipment that Summit services is ultrasound machines

17  manufactured by Philips. (*Id.* ¶ 18.) Philips's ultrasound machines are "expensive and

18  complex equipment that include both mechanical and computer software components."

19  (*Id.* ¶ 19.) Although Philips's ultrasound machines have a long lifespan, they require

20

21  _____

    [1] The parties have requested oral argument. (*See* Mot. at 1, Resp. at 1.) The court finds
22  oral argument would not be helpful to the disposition of this motion, and therefore declines to
    hold oral argument. *See* Local Rules W.D. Wash. LCR 7(b)(4).

ORDER - 2

1  frequent maintenance, repair, and other servicing.  (*Id.*)  In addition to manufacturing and

2  selling its ultrasound machines, Philips provides maintenance and repair services for the

3  machines.  (*Id.* ¶ 23.)  As a result, Philips competes with Summit and other ISOs for

4  business in the market for maintenance and repair services for Philips's ultrasound

5  machines.  (*Id.* ¶ 24.)

6        Summit alleges that the software included on Philips's ultrasound machines "is

7  necessary for both operating the equipment and for properly diagnosing, troubleshooting,

8  and correcting" technical issues with the machines.  (*Id.* ¶ 20.)  Summit further alleges

9  that Philips "regulates and restricts access to and operation of" this software by

10  individuals and entities outside of Philips, including the purchasers of the machines and

11  ISOs such as Summit that provide maintenance and repair services.  (*Id.* ¶ 21.)

12        Summit alleges that access to the diagnostic software is "vital to competition" in

13  the market for servicing Philips's ultrasound machines because it provides access to tools

14  that "are essential for diagnosing, troubleshooting, and correcting technical problems or

15  issues with" the machines.  (*Id.* ¶ 34; *id.* ¶¶ 35-37 (describing alleged features of Philips's

16  diagnostic software that are unavailable to competitors, such as the ability to translate

17  error codes, correct errors, and display temperature sensor data).)  Philips "does not and

18  will not provide access to the Diagnostic Software" to its competitors in the Philips

19  ultrasound machine service market, including Summit.  (*Id.* ¶ 40.)  Indeed, Philips has

20  never granted access to the diagnostic software to Summit.  (*Id.* ¶ 41.)  Summit asserts

21  that Philips's refusal to provide access to the diagnostic software has impaired or

22

1  prevented Summit and Philips's other competitors from performing certain maintenance

2  and repair services for their customers.  (*Id.* ¶¶ 42-43.)

3      In an effort to "find ways to work around its lack of access to the Philips

4  Diagnostic Software," Summit developed its own "proprietary software" to enable it to

5  service Philips's ultrasound machines.  (*Id.* ¶ 44.)  Summit states that its software has a

6  "commercially significant, useful and lawful purpose" and "does not circumvent any

7  purported technological measure that Philips might include in its software, falsify or

8  remove any purported copyright information, or otherwise violate the DMCA or infringe"

9  Philips's copyrights in any way.  (*Id.* ¶¶ 44, 57.)

10     Summit alleges that Philips has engaged in anticompetitive conduct in order to

11  increase its share of the market for repair and maintenance of its ultrasound machines,

12  control prices, and exclude competitors from the market.  (*Id.* ¶ 25.)  This anticompetitive

13  conduct includes Philips's refusal to provide its competitors access to diagnostic software

14  installed on its ultrasound machines and Philips's efforts to enforce its copyrights on that

15  software.  (*See, e.g., id.* ¶¶ 33-34, 40, 47, 49, 51, 57, 74-75.)  Summit also alleges that

16  Philips's refusal to license its copyrights in the diagnostic software, and its enforcement

17  or threatened enforcement of those copyrights (as in this lawsuit, which seeks to prevent

18  Summit from using its proprietary software) is anticompetitive conduct.  (*See, e.g., id.*

19  ¶¶ 54, 57-58.)  Summit asserts that Philips's refusal to license its copyrights and its

20  enforcement actions are motivated not by a legitimate desire to protect its copyrights but

21  rather by Philips's goal to exclude competition in the market for repair and servicing of

22  its ultrasound machines.  (*Id.* ¶¶ 51-57.)

ORDER - 4

1

**B.     Procedural Background**

2        Philips filed its initial complaint in this action on October 29, 2019.  (Compl. (Dkt.

3  # 1).)  It filed an amended complaint on December 20, 2019.  (Am. Compl. (Dkt. # 23).)

4  Philips's claims against Summit arise from its allegation that Summit hacks into Philips's

5  ultrasound systems using a program Summit developed in order to enable features or

6  options in the ultrasound systems for which Philips's customers have not paid.  (Am.

7  Compl. ¶¶ 4-6.)  Philips also alleges that Summit wrongfully advertises that its software

8  is a "legal solution" or "legal alternative" to working with Philips in order to enable

9  features and options in the ultrasound systems.  (*See id.* ¶ 8.)

10       The court granted in part and denied in part Summit's subsequent motion to

11  dismiss Philips's claims.  (3/30/2020 Order (Dkt. # 35).)  Specifically, the court

12  dismissed, without prejudice and with leave to amend, Philips's claims against Summit

13  for modifying copyright management information in violation of the Digital Millennium

14  Copyright Act ("DMCA"), 17 U.S.C. § 1202; false advertising in violation of the

15  Lanham Act, 15 U.S.C. § 1125(a); and unfair competition in violation of Washington's

16  Consumer Protection Act ("CPA"), ch. 19.86 RCW.  (3/30/2020 Order at 20-21.)  The

17  court denied Summit's motion to dismiss Philips's claims for circumventing a

18  technological measure in violation of the DMCA; trade secret misappropriation in

19  violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Uniform Trade Secrets

20  Act, ch. 19.108 RCW; and for contributory copyright infringement in violation of the

21  Copyright Act, 17 U.S.C. §§ 101, 501.  (3/30/2020 Order at 20-21.)

22

On April 20, 2020, Philips filed its second amended complaint. (2d Am. Compl. (Dkt. # 36).) Summit answered the second amended complaint on May 18, 2020 and asserted counterclaims. (*See generally* Ans. & Counterclaims (Dkt. # 41).) In its counterclaims, Summit alleges that Philips has engaged in monopolization and attempted monopolization in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. (Counterclaims ¶¶ 26-64 (monopolization), 65-68 (attempted monopolization).) Summit also seeks a declaratory judgment that Philips's copyrights on the diagnostic software installed on its ultrasound machines are unenforceable due to Philips's misuse of those copyrights. (*Id.* ¶¶ 69-82.) Philips now moves to dismiss all of Summit's counterclaims. (*See generally* Mot.)

## II.    ANALYSIS

### A.    Standard on Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). The court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "To survive a motion to dismiss, a

1    complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

2    relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

3    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Telesaurus VPC, LLC v.*

4    *Power*, 623 F.3d 998, 1003 (9th Cir. 2010).  "A claim has facial plausibility when the

5    plaintiff pleads factual content that allows the court to draw the reasonable inference that

6    the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 677-78.  Dismissal

7    under Rule 12(b)(6) can be based on the lack of a cognizable legal theory or the absence

8    of sufficient facts alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police*

9    *Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

10   **B.    Monopolization Claims**

11        Section 2 of the Sherman Antitrust Act makes it illegal to "monopolize . . . any

12   part of the trade or commerce among the several states."  15 U.S.C. § 2.  The

13   requirements for monopolization and attempted monopolization claims "are similar,

14   differing primarily in the requisite intent and the necessary level of monopoly power."

15   *Image Tech. Servs. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir. 1997).  To state

16   a claim for monopolization under § 2, the plaintiff must allege facts that, if true, will

17   prove the defendant (1) possesses monopoly power and (2) uses that power to "foreclose

18   competition, to gain a competitive advantage, or to destroy a competitor."  *Aerotec Int'l,*

19   *Inc. v. Honeywell Int'l., Inc.*, 836 F.2d 1171, 1183 (9th Cir. 2016) (quoting *Eastman*

20   *Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482-83 (1992) ("*Kodak*")).  To state a

21   claim for attempted monopolization, the plaintiff must allege facts that, if true, will prove

22   "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

1    specific intent to monopolize and (3) a dangerous probability of achieving monopoly

2    power." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1043–44

3    (9th Cir. 2009) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

4    "To safeguard the incentive to innovate, the possession of monopoly power will not be

5    found unlawful [under § 2] unless it is accompanied by an element of anticompetitive

6    conduct." *Verizon Comm'cns Inc. v. Law Offices of Curtis V. Trinko* ("*Trinko*"), LLP,

7    540 U.S. 398, 407 (2004).

8        1.    *Noerr-Pennington* **Immunity**

9        Summit alleges that Philips has engaged in anticompetitive conduct prohibited by

10   Section 2 of the Sherman Act by filing its lawsuit seeking to enforce its copyrights in the

11   software installed on its ultrasound machines.  (*See, e.g.*, Counterclaims ¶¶ 57-58.)

12   Philips contends that Summit's claims based on Philips's efforts to enforce its copyrights

13   are barred by the *Noerr-Pennington* doctrine.  "That doctrine provides a party immunity

14   from antitrust liability for petitioning the government for redress, in light of the First

15   Amendment right to petition the government.  And it is clear that the petitioning activity

16   includes enforcing one's intellectual property rights in court." *United Food and*

17   *Commercial Workers Unions and Emp'rs v. Novartis Pharmaceuticals Corp.*, 902 F.3d 1,

18   4-5 (1st Cir. 2018) (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*

19   ("*PREI*"), 508 U.S. 49, 63-65 (1993)) (applying *Noerr-Pennington* and affirming the

20   dismissal of plaintiff's antitrust claims arising from Novartis's efforts to enforce its

21   patents on a prescription drug).  An entity loses *Noerr–Pennington* immunity from anti-

22   trust liability, however, if its conduct falls within the "sham" exception to the doctrine.

1    *Kaiser Found. Health Plan, Inc.*, 552 F.3d at 1044.  A "sham" lawsuit is one where the

2    suit is both "objectively baseless in the sense that no reasonable litigant could realistically

3    expect success on the merits" and "an attempt to interfere *directly* with the business

4    relationship of a competitor through the use of the governmental *process*—as opposed to

5    the *outcome* of that process."  *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,

6    745 F.3d 343, 351-52 (9th Cir. 2014) (quoting *PREI*, 508 U.S. at 60–61) (emphasis in

7    original)).

8         Summit does not allege that Philips has engaged in sham litigation to enforce its

9    copyrights.  (Resp. at 13.)  Rather, it argues that the *Noerr-Pennington* doctrine does not

10   bar its claims because they are not based "*solely*" on Philips's non-sham litigation.

11   (Resp. at 11-12 (emphasis in original).)  Relying primarily on *Clipper Exxpress v. Rocky*

12   *Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1265 (9th Cir. 1982), Summit argues

13   that *Noerr-Pennington* does not apply here because "Plaintiffs' litigation activity is part

14   of a broader scheme of anticompetitive conduct."  (Resp. at 13.)[2]

15        In *Clipper Exxpress*, the plaintiff, a freight forwarding company, alleged that the

16   defendant trucking company had engaged in sham rate protests and had provided

17   fraudulent information to a regulatory agency as part of a larger scheme to stifle

18   competition that included price-fixing and customer allocation.  *Id.* at 1246-63.  The

19   *Clipper Exxpress* court recognized that "[g]enuine efforts to induce governmental action

20   are shielded by *Noerr* even if their express and sole purpose is to stifle or eliminate

21

22        [2] Philips does not respond to Summit's arguments regarding *Clipper Exxpress*.  (*See generally* Reply.)

ORDER - 9

competition." *Id.* at 1254.  Nevertheless, the court also observed that "when . . . the

petitioning activity is but part of a larger overall scheme to restrain trade, there is no

*overall* immunity." *Id.* at 1263-64 (emphasis added).  Rather, *Noerr-Pennington*

"provides immunity only for the narrow petitioning activity, if done with the requisite

intent to influence government action." *Id.* at 1265.

Here, Summit challenges Philips's entire course of conduct—not just Philips's

efforts to enforce its copyrights in court.  Although *Noerr-Pennington* provides Philips

immunity from antitrust liability against Summit's claims based on Philips's legitimate,

non-sham litigation activity, that immunity does not extend to Summit's other allegations

of anticompetitive conduct.  *See Clipper Exxpress*, 690 F.3d at 1263-64.  Therefore, the

court DISMISSES with prejudice Summit's antitrust claims under the *Noerr-Pennington*

doctrine only to the extent they are premised on Philips's litigation activity.  *See Lopez v.

Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (where claims are dismissed under Rule

12(b)(6), the court "should grant leave to amend . . . unless it determines that the pleading

could not possibly be cured by the allegation of other facts.").

### 2. Relevant Market

"A threshold step in any antitrust case is to accurately define the relevant market,

which refers to 'the area of effective competition.'" *Federal Trade Comm'n v.

Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*,

138 S. Ct. 2274, 2285 (2018)).  The plaintiff must allege both that a legally cognizable

'relevant market' exists and that the defendant has power within that market.  *Newcal

Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044 (9th Cir. 2008).  "There is no

1  requirement that these elements of the antitrust claim be pled with specificity." *Id.* at

2  1045.  Although the validity of the "relevant market" is typically a factual element rather

3  than a legal element, a complaint may be dismissed if the complaint's "relevant market"

4  definition is "facially unsustainable." *Id.*

5  Summit alleges that the relevant market for its antitrust claims is the market for

6  "provision of . . . maintenance and repair services on Philips Ultrasound Machines in the

7  United States" (the "Philips Ultrasound Machine Service Market").  (Counterclaims

8  ¶ 27.)  Summit asserts that Philips's market power is demonstrated by its dominant share

9  in the market, which Summit estimates is at least 76% of the market based on 2018 data

10  showing that OEMs "typically account for greater than 76% of the revenue generated in

11  service aftermarkets for specialized medical equipment, including ultrasound machines."

12  (*Id.* ¶ 28.)  Summit also alleges that there are barriers to entry in the market arising from

13  high costs to enter and participate in the market, the high level of technical skill and

14  knowledge of Philips's ultrasound machines required to participate in the market, and

15  Philips's own actions in controlling and restricting access to the software on the

16  ultrasound machines.  (*Id.* ¶¶ 31-32.)

17  Philips argues that Summit has failed to sufficiently plead "a plausible single-

18  modality, single-brand relevant market."  (Reply at 9.)  First, it contends that Summit

19  fails to allege facts regarding why other imaging systems are not reasonably

20  interchangeable with ultrasound systems for purposes of providing maintenance, repair

21  and related services or why the market does not encompass manufacturers other than

22  Phillips.  (Reply at 8-9.)  Second, it argues that Summit has failed to allege "a change in

1    policy or other deceptive conduct that 'locks in' customers" in order to demonstrate

2    market power.  (*Id.* at 10 (citing *Newcal*, 513 F.3d at 1045, 1051, and *POURfect Prod. v.*

3    *KitchenAid*, No. CV-09-2660PHXGMS, 2010 WL 1769413, at *3-4 (D. Ariz. May 3,

4    2010)).)  Finally, Philips argues that Summit's allegation of Philips's market share

5    "cannot stand" because it depends on an "unidentified" study regarding OEMs' share of

6    the revenue generated in service aftermarkets for specialized medical equipment and is

7    not specific to Philips or ultrasound machines.  (*Id.* at 10-11 (citing *Rebel Oil*, 51 F.3d at

8    1434 (9th Cir. 1995).)

9         The court finds that Summit has sufficiently alleged a relevant market in which

10   Philips has market power.  It is clear that an antitrust plaintiff may base its claims on a

11   single-product relevant market.  *See Kodak*, 504 U.S. at 456-59 (markets for Kodak parts

12   and service); *Newcal*, 513 F.3d at 1048 (markets for IKON and GE copier equipment and

13   copier service).  Because the relevant market for aftermarket service must be determined

14   based on the choices available to the owners of Philips ultrasound machines, *see Kodak*,

15   504 U.S. at 482, Summit need not plead facts regarding other imaging systems or

16   ultrasound systems made by manufacturers other than Philips in order to sufficiently

17   allege a single-brand relevant market.

18        The court also concludes that Summit has plausibly alleged that Philips possesses

19   market power in the relevant market.  The existence of an antitrust defendant's market

20   power "ordinarily is inferred from the seller's possession of a predominant share of the

21   market."  *Kodak,* 504 U.S. at 464 (internal citations omitted).  The Supreme Court has

22   concluded that market shares similar to the 76% market share that Summit alleges Philips

1    possesses are sufficient to demonstrate monopoly power under Section 2.  *See United*

2    *States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966) (87% of market constitutes a

3    monopoly); *American Tobacco Co. v. United States,* 328 U.S. 781, 797 (1946) (over two-

4    thirds of market constitutes a monopoly).  Whether Philips's market share is actually 76%

5    percent is a factual issue that must be tested through discovery.

6           Philips argues that Summit must allege that Philips initiated a change in policy

7    that would "lock-in" customers in order to survive a motion to dismiss.  (See Mot. at 9-

8    10.)  The court disagrees.  Rather, the court concludes that the lesson from *Kodak* and

9    *Newcal* is that an aftermarket shift in policy is one example of a way in which a firm may

10   exercise its market power.  *See Kodak*, 504 U.S. at 458 (discussing "lock-ins" in the

11   context of a Sherman Act § 1 tying claim); *Newcal*, 513 F.3d at 1051 (same); *see also*

12   *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (same).[3]

13   For these reasons, the court DENIES Philips's motion to dismiss to the extent it alleges

14   that Summit's case should be dismissed for failure to plausibly allege a "relevant market"

15   in which Philips possesses market power.

16

17

18

19          [3] To the extent Philips relies on *POURfect Products*, 2010 WL 1769413, at *3-4, the
20   court finds that Summit has sufficiently alleged facts that make the factors listed in that case
     plausible:  the existence of high "switching costs," high "information costs," and a "substantial"
21   ability to exploit "ignorant" customers.  (*See, e.g.*, Counterclaims ¶ 19 (alleging that Philips
     ultrasound machines are "expensive and complex" equipment with a "relatively long lifespan"
     and that purchasers "are not able to accurately predict required maintenance or estimate long-
22   term maintenance costs at the time of purchase.")

### 3.     Refusal to Deal

"As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]" *Aerotec Int'l*, 836 F.3d at 1184 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)).  "The Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (internal citations and alterations omitted).

"The one, limited exception to the general rule that there is no antitrust duty to deal comes under the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)." *Qualcomm*, 969 F.3d at 993.  Under the *Aspen Skiing* exception, a company engages in prohibited, anticompetitive conduct when "(1) it unilaterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Id.* at 993-94 (quoting *Aerotec Int'l*, 836 F.3d at 1184, and *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004)) (internal citations and quotation marks omitted).  Because the *Aspen Skiing* exception is "at or near the outer boundary of § 2 liability," it should be applied only in rare circumstances. *Qualcomm*, 969 F.3d at 994 (quoting *Trinko*, 540 U.S. at 409).

1    Here, Summit alleges that Philips engaged in anticompetitive conduct under

2    Section 2 of the Sherman Act by refusing to give access to its diagnostic software to

3    Summit and other competitors.  (Counterclaims ¶ 49.)  Summit does not, however, allege

4    that Philips has "unilaterally terminate[d] a voluntary and profitable course of dealing."

5    *Qualcomm*, 969 F.3d at 994.  Indeed, according to Summit, "Philips has *never* granted

6    access to the Philips Diagnostic Software to Summit."  (Counterclaims ¶ 41 (emphasis

7    added).)  Summit's allegation that Philips has never granted it access to the diagnostic

8    software directly contradicts the requirement that it plead a unilateral termination of a

9    voluntary course of dealing.  That allegation is therefore fatal to Summit's argument that

10   the court should apply the *Aspen Skiing* exception to the general rule that there is no duty

11   to deal.  *See Qualcomm*, 969 F.3d at 994-95 (reversing the district court's holding that

12   Qualcomm was under an antitrust duty to deal where the district court's conclusion that

13   Qualcomm had terminated a voluntary and profitable course of dealing with respect to its

14   previous licensing practices was in error).

15   In its surreply, Summit argues that "any interpretation [of *Aspen Skiing*] that

16   requires every refusal to deal case to meet the exact factual elements present in *Aspen*

17   *Skiing* is contrary to existing Ninth Circuit precedent."  (Surreply at 2.)  Summit relies on

18   *Image Technical Services*, 125 F.3d at 1211, for the proposition that a plaintiff need not

19   allege a prior course of dealing to plead a refusal to deal claim.  (*See id.*)  Summit asserts

20   in a footnote that *Trinko*, which recognized the significance of "the unilateral termination

21   of a voluntary course of dealing" in *Aspen Skiing*, *see Trinko,* 540 U.S. at 409, did not

22   "alter *Aspen Skiing*'s general rule that the presence of 'valid business reasons' is the

1    touchstone for determining whether or not a refusal to deal is anticompetitive." (Surreply

2    at 3 n.3.)  Although the court is sympathetic to Summit's argument, the Ninth Circuit has

3    instructed that there is but "*one*, limited exception to the general rule that there is no

4    antitrust duty to deal," and that proof of that exception requires a showing that the

5    defendant "unilaterally terminate[d] a voluntary and profitable course of dealing."

6    *Qualcomm*, 969 F.3d at 993 (emphasis added), 995 (observing that a unilateral

7    termination of a voluntary course of dealing is a "required element[] for the *Aspen Skiing*

8    exception"). This court is bound to follow Ninth Circuit precedent.[4]  Because Summit's

9    allegation that "Philips has never granted access to the Philips Diagnostic Software to

10   Summit" establishes that Summit cannot prove a claim for refusal to deal under the

11   limited *Aspen Skiing* exception, the court GRANTS Philips's motion to dismiss Summit's

12   Sherman Act § 2 claims for monopolization and attempted monopolization based on its

13   refusal to deal theory with prejudice. *See Lopez v. Smith*, 203 F.3d at 1127.

14        **4.    Essential Facility**

15        Summit also alleges that Philips violated Section 2 of the Sherman Act under an

16   essential facilities theory. The essential facilities doctrine is a "variation on a refusal to

17   deal claim." *Aerotec Int'l,* 936 F.3d at 1184.  It "imposes liability where competitors are

18   denied access to an input that is deemed essential, or critical, to competition." *Id*.  To

19   establish a violation of the essential facilities doctrine, Summit must show (1) that Philips

20

21        [4] The *Qualcomm* panel that set forth the elements of the *Aspen Skiing* exception was
     aware of *Image Technical Services*. *See Qualcomm*, at 969 F.3d at 992 (quoting *Image*
22   *Technical Services*, 125 F.3d at 1202, for its definition of "relevant market").

1    is a monopolist in control of an essential facility, (2) that Summit, as Philips's

2    competitor, is unable reasonably or practically to duplicate the facility, (3) that Philips

3    has refused to provide Summit access to the facility, and (4) that it is feasible for Philips

4    to provide such access.  *Id.* at 1185 (citing *MetroNet Servs.*, 383 F.3d at 1128-29).

5    Because mandating access shares the same concerns as mandating dealing with a

6    competitor, a facility is essential "only if control of the facility carries with it the power

7    to *eliminate* competition in the downstream market."  *Id.* (quoting *Alaska Airlines, Inc. v.*

8    *United Airlines, Inc.*, 948 F.2d 536, 546 (9th Cir. 1991) (emphasis in original)).

9           Summit alleges that the diagnostic software that runs on Philips's ultrasound

10   machines is an essential facility that is necessary for competition in the Philips

11   Ultrasound Machine Service Market.  (Counterclaims ¶ 34.)  Summit alleges that

12   "[c]ertain aspects of the software are vital to competition" in that market "because they

13   provide access to tools that are essential for diagnosing, troubleshooting and correcting

14   technical problems or issues," such as identifying error codes, providing tools that allow

15   the machine's operator to troubleshoot and identify the issue that caused an error code,

16   and displaying data regarding thermal and electrical sensors.  (*Id.* ¶¶ 35-37.)  Summit

17   alleges that there is no way other than Philips's diagnostic software to view sensor data

18   and to determine from the error codes what repairs to make.  (*Id.* ¶ 37-88.)  For these

19   reasons, according to Summit, Philips's diagnostic software is "necessary and vital to

20   providing repair and maintenance services for Philips Ultrasound Machines and

21   constitutes an essential facility in the Philips Ultrasound Service Market."  (*Id.* ¶ 39.)

22   Summit further alleges that Philips's diagnostic software cannot be practically or

1   economically duplicated, that Philips has refused to license or otherwise provide access

2   to the software, and that when Summit has tried to find ways to work around its lack of

3   access to the software, Philips has initiated legal action.  (*Id.* ¶¶ 43-45.)

4           In contradiction to the above, however, Summit also alleges that there are

5   competitors in addition to Summit and Philips in the relevant market for service of

6   Philips's ultrasound machines, that Summit is able to deliver high-quality service for

7   Philips's ultrasound machines at a low cost, and that it has developed a lawful alternative

8   to Philips's software that does not violate Philips's copyrights.  (*Id.* ¶¶ 17, 22- 24, 28, 30,

9   57.)  Thus, Summit's own allegations show that Philips does not have the power to

10  "*eliminate* competition" in the market for service of its ultrasound machines by its control

11  of access to its diagnostic software.  *Alaska Airlines, Inc.*, 948 F.2d at 546 (emphasis in

12  original); *see Kinderstart.com LLC v. Google, Inc.*, No. C 06-2057 JF (RS), 2006 WL

13  3246595, at *9-10 (N.D. Cal. Jul. 13, 2006) (dismissing essential facilities claim where

14  plaintiff alleged that it maintained website content, generated sustainable traffic, and

15  received high rankings from other search engines).  Based on the foregoing, the court

16  concludes that Summit has failed to plausibly allege Sherman Act § 2 claims for

17  monopolization and attempted monopolization based on an essential facilities theory.

18  The court DISMISSES these claims without prejudice and with leave to amend.  *See*

19  *Lopez v. Smith*, 203 F.3d at 1127.

20  **C.     Misuse of Copyright Claim**

21          Summit also seeks a declaratory judgment that Philips's legal actions with respect

22  to its claims under the DMCA and its claims for copyright infringement constitute a

1    misuse of copyright, thus making Philips's copyrights in the software installed on its

2    ultrasound machines unenforceable as long as the alleged copyright misuse continues.[5]

3    (Counterclaims ¶¶ 69-82; *see also id.* at 46, ¶¶ D & E.)

4          "Copyright misuse is a judicially created affirmative defense to copyright

5    infringement." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).  The

6    equitable defense of copyright misuse "forbids a copyright holder from securing an

7    exclusive right or limited monopoly not granted by the Copyright Office" by preventing

8    "copyright holders from leveraging their limited monopoly to allow them control of areas

9    outside the monopoly." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th

10   Cir. 2001) (internal quotations omitted).  The doctrine "does not prohibit using conditions

11   to control use of copyrighted material, but it does prevent copyright holders from using

12   the conditions to stifle competition." *Apple*, 658 F.3d at 1159.  The Ninth Circuit has

13   "applied the doctrine sparingly." *Id.* at 1157.  A successful copyright misuse defense

14   precludes a copyright owner from enforcing the copyright during periods of misuse.  *See*

15   *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997).

16         Summit alleges that Philips has moved to enforce its copyrights on the software

17   installed on its ultrasound machines, including its diagnostic software, with the intent to

18

19         [5] In a footnote, Philips argues that copyright misuse is cognizable only as an affirmative
     defense.  (Mot. at 18 n.1.)  The court notes, however, that *Apple v. Psystar*, 658 F.3d 1150, 1154
20   (9th Cir. 2011), involved a counterclaim for a declaratory judgment that Apple was misusing its
     copyrights.  *See also Philips N. Am. LLC v. KPI Healthcare, Inc.*, No. SACV191765JVSJDEX,
21   2020 WL 5260865, at *4 (C.D. Cal. July 24, 2020) (denying motion to dismiss copyright misuse
     counterclaim).  The court therefore proceeds to evaluate Summit's counterclaim.

22

1  exclude competition in the market for Philips ultrasound machine repair and service.

2  (Counterclaims ¶¶ 71-74, 76.)  It also alleges that Philips's attempts to exclude

3  competition for repair and maintenance services for its ultrasound machines by refusing

4  to license the copyrights for its diagnostic software.  (*Id.* ¶ 75.)  As a result, according to

5  Summit, Philips is improperly attempting to extend the limited monopoly granted by

6  Philips's copyrights.  (*Id.* ¶ 79.)  The court finds that Summit has sufficiently alleged a

7  counterclaim for misuse of copyright.  *See Philips N. Am. LLC v. KPI Healthcare, Inc.*,

8  No. SACV191765JVSJDEX, 2020 WL 5260865, at *4 (C.D. Cal. July 24, 2020)

9  (denying Philips's motion to dismiss copyright misuse counterclaim).

10        Although Philips argues that Summit's copyright misuse claim is barred by the

11  *Noerr-Pennington* doctrine, that doctrine does not bar Summit's copyright misuse claim.[6]

12  *Practice Mgmt.*, 121 F.3d at 521 (declining to consider a *Noerr-Pennington* defense to

13  copyright misuse).  Philips also argues that Summit's counterclaim should be dismissed

14  because the Ninth Circuit has not upheld a copyright misuse defense or claim under facts

15  similar to those presented here.  The Ninth Circuit cases Philips cites, however, were

16  decided on more developed records in the context of motions for summary judgment or

17  for preliminary injunction, rather than motions to dismiss.  (*See* Reply at 6-7 (citing

18

19        [6] This result is not incongruent with the court's prior holding that Noerr-Pennington
precludes Summit from pursuing its *antitrust* counterclaims arising from Philips's efforts to

20  enforce its copyrights, *see supra* Section II.B.1, because the remedies available to a successful
antitrust plaintiff are far greater than those available on a successful claim of copyright misuse.

21  A plaintiff that succeeds on an antitrust claim is entitled to substantial remedies, including treble
damages.  *See* 15 U.S.C. § 15(a).  The remedy for a successful copyright misuse claim, in

22  contrast, is limited to an order precluding the copyright owner from enforcing the copyright
during periods of misuse.  *See Practice Mgmt.*, 121 F.3d at 520.

*Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 700 (9th Cir. 2015), *Apple*, 658

F.3d at 1157; *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026-27 (9th Cir. 2001);

and *Practice Mgmt.*, 121 F.3d at 520).)  The court, therefore, DENIES Philips's motion to

dismiss Summit's copyright misuse counterclaim.

### III.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part

Philips's motion to dismiss (Dkt. # 50).

- The court GRANTS Philips's motion to dismiss Summit's Sherman Act § 2
  antitrust counterclaims arising from Philips's legal action to enforce its copyrights
  in the diagnostic software.  Summit's antitrust counterclaims are DISMISSED
  with prejudice to the extent they arise from Philips's attempts to enforce its
  copyrights.

- The court GRANTS Philips's motion to dismiss Summit's Sherman Act § 2
  antitrust counterclaims based on a "refusal to deal" theory.  These counterclaims
  are DISMISSED with prejudice.

- The court GRANTS Philips's motion to dismiss Summit's Sherman Act § 2
  antitrust counterclaims based on an "essential facilities" theory.  These
  counterclaims are DISMISSED without prejudice and with leave to amend.

- The court DENIES Philips's motion to dismiss Summit's counterclaim seeking a
  declaratory judgment that Philips has misused its copyrights.

//

1    Summit shall file amended counterclaims, if any, alleging facts that resolve the

2  issues stated herein, by no later than twenty days from the filing date of this order.

3

4    Dated this 16th day of November, 2020.

5

6

7    JAMES L. ROBART
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22