1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

PHILIPS NORTH AMERICA LLC, et al.,

                    Plaintiffs,

11

12

     v.

13

SUMMIT IMAGING INC., et al.,

14

                    Defendants.

CASE NO. C19-1745JLR

ORDER ON MOTIONS TO EXCLUDE

PROVISIONALLY FILED UNDER SEAL

15

16

## I.    INTRODUCTION

17

18

19

20

21

22

Before the court are four motions to exclude:  (1) Defendants Summit Imaging Inc. and Lawrence R. Nguyen's (collectively, "Summit") motion to exclude portions of Dr. Patrick Kennedy and Dr. Adam Sorini's testimonies (MTE Sorini & Kennedy (Dkt. ## 131 (sealed), 132 (redacted))); (2) Plaintiffs Philips North America, LLC, Koninklijke Philips N.V., and Philips India, Ltd.'s (collectively, "Philips") motion to exclude Drew Voth's testimony (MTE Voth (Dkt. ## 144 (sealed), 149 (redacted))); (3) Philips's

1   motion to exclude Stephen L. Grimes's testimony (MTE Grimes (Dkt. ## 142 (sealed),

2   146 (redacted))); and (4) Philips's motion to exclude Dr. Aviel D. Rubin's testimony

3   (MTE Rubin (Dkt. ## 143 (sealed), 148 (redacted))).  Each opposes the other's motions.

4   (*See* MTE Sorini & Kennedy Resp. (Dkt. ## 265 (sealed), 266 (redacted)); MTE Voth

5   Resp. (Dkt. ## 210 (sealed), 211 (redacted)); MTE Grimes Resp. (Dkt. ## 199 (sealed),

6   200 (redacted)); MTE Rubin Resp. (Dkt. # 206).)  Summit additionally filed a surreply to

7   Philips's motion regarding Mr. Voth.  (Surreply (Dkt. ## 280 (sealed), 281 (redacted)).)

8        The court has reviewed the motions, the parties' submissions, the relevant portions

9   of the record, and the applicable law.  The court additionally held oral arguments on May

10  11, 2021.  (5/11/21 Min. Entry (Dkt. # 307).)  Being fully advised, the court DENIES

11  Summit's motion to exclude Drs. Sorini and Kennedy's testimonies; GRANTS in part

12  and DENIES in part Philips's motion to exclude Mr. Voth's testimony; DENIES

13  Philips's motion to exclude Mr. Grimes's testimony; and DENIES Philips's motion to

14  exclude Dr. Rubin's testimony as moot.

15              **II.    BACKGROUND**

16       Philips is an original equipment manufacturer ("OEM") that develops, sells and

17  services medical imaging systems, including the Ultrasound Systems at issue in the

18  instant suit.  (TAC (Dkt. # 99) ¶ 1.)  These Ultrasound Systems include proprietary

19  hardware and software that are "necessary to operate, service, and repair Philips'[s]

20  systems" and may only be used when Philips enables a particular licensable feature.  (*Id.*

21  ¶¶ 1, 33.)  Philips holds the copyright in the software for these systems.  (*Id.* ¶ 30, Ex. A.)

22  Philips claims that Summit, an independent service organization ("ISO"), hacks into its

1  software and alters the Ultrasound Systems using a program Summit developed called

2  Adepto to enable features or options that customers have not paid Philips for.  (*Id.* ¶ 4.)

3       Philips brings seven claims against Summit:  (1) circumventing a technological

4  measure in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201

5  ("DMCA"); (2) modifying copyright management information in violation of the DMCA,

6  17 U.S.C. § 1202; (3) trade secret misappropriation in violation of the Defend Trade

7  Secrets Act, 18 U.S.C. § 1836; (4) trade secret misappropriation in violation of the

8  Washington Uniform Trade Secrets Act, RCW 19.108 *et. seq*; (5) false advertising in

9  violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (6) unfair competition

10  in violation of the Washington Consumer Protect Act, RCW 19.86.020, *et. seq*; and (7)

11  copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 101, 501.

12       The parties rely on expert witness testimony opining on matters ranging from the

13  role of ISOs in the healthcare industry to analysis of the source code and damages.  (*See*

14  *generally* Dkt.)  The court summarizes the testimony of the challenged expert witnesses.

15  **A.    Dr. Adam Sorini**

16       Dr. Sorini is a Principal Scientist at Exponent, Inc., an engineering and scientific

17  consulting firm.  (Sorini Decl. (Dkt. # 176 (redacted)) ¶ 3, Ex. S ("Sorini Rep.") ¶¶ 1, 7.)[1]

18  He has a Ph.D. focused on "computational aspects of solid-state physics, including

19  numerical calculations using computer software" and has researched "large-scale

20  computational physics research" and development of "computer software to study

21

22  _____

[1] Dr. Sorini's report is separately filed under seal as Exhibit S to his declaration.  (*See* Ex. S (Dkt. # 177).)

1    electronic systems." (*Id.* ¶¶ 9-10.)  His work at Exponent is in the field of computer

2    science, cybersecurity, and digital forensics, and he regularly works with software and

3    firmware within devices, including medical devices, to understand software functionality.

4    (*Id.* ¶¶ 11-12, 15.)  Philips retained Dr. Sorini in part to review Philips technology and to

5    communicate his findings to Dr. Kennedy, the damages expert.  (*Id.* ¶¶ 5-6.)

6           As part of his analysis, Dr. Sorini reviewed code-counting analysis documents

7    produced by Philips software developers as a basis to estimate development costs.  (*Id.*

8    ¶ 344.)  Philips software developers used the Visual Studio Code Metrics code analysis

9    tool to identify and count the lines of code related to Philips software; after reviewing the

10   counts with the developers, Dr. Sorini calculated ████ total lines of relevant code.

11   (*Id.* ¶¶ 345-49.)  He then estimated the development time associated with those lines by

12   inputting the code into the COCOMO-II model, a model that "provides a reasonable basis

13   to estimate hours required for software development times and costs." (*Id.* ¶ 350.)  The

14   COCOMO-II model requires identification of several inputs regarding the nature of the

15   software project, such as "product complexity" or "required software reliability." (*Id.*)

16   Dr. Sorini utilized the default average settings of "nominal," which he believes is "a

17   conservative approach that would likely underestimate the actual hours incurred." (*Id.*)

18   The COCOMO II model indicated that the total effort to produce the ████ lines of

19   code would be ████ person-months.[2]  (*Id.* ¶ 351.)

20   //

21

22          [2] Person-months is a measure of the time it would take someone to produce the analyzed
     lines of code.  (*See* Sorini Rep. ¶ 351.)

In his deposition, Dr. Sorini confirmed that he did not review the content of the source code identified by Philips developers, noting that he "rel[ied] on [the developer] for that input." (Danley Decl. (Dkt. # 133) ¶ 3, Ex. A ("Sorini Dep.") at 236:15-19; 242:16-22.) However, he did "review [the developer's] process to make sure that [it] was reasonable." (*Id.* at 236:19-21; 242:16-22.) He further confirmed that this count was "an analysis of Philips software" and not "about how it relates to Summit." (*Id.* at 240:7-14; *see id.* at 243:1-6 ("[T]here's nothing in this analysis that would depend on what Summit Imaging does.").) Philips's developers also had no information or knowledge of Summit's activities. (*See* Danley Decl. ¶ 8, Ex. F at 191:20-22; *id.* ¶ 9, Ex. G at 37:5-13.)

**B.    Dr. Patrick Kennedy**

Philips retained Dr. Kennedy as its damages expert. Dr. Kennedy calculated the avoided software development costs that Summit allegedly circumvented by wrongfully accessing Philips's software—that is, what it would have cost Summit to have developed these functionalities itself. (Danley Decl. ¶ 4, Ex. B ("Kennedy Rep.") ¶¶ 100-13.) Using Dr. Sorini's calculation of the total effort to produce the code at issue, Dr. Kennedy converted that estimated effort— ███ Person-months—to a monetary value. (*Id.* ¶¶ 106-08.) Using Philips's salaries for software engineers and related staff as a proxy and adjusting for other costs such as payroll taxes and benefits, Dr. Kennedy estimates Summit's avoided development costs to be ███ . (*Id.* ¶¶ 108-09, 113.)

**C.    Drew Voth**

Mr. Voth is a Certified Public Accountant and Senior Director with the tax and business advisory organization Alvarez & Marshal Valuation Services, LLC. (4/5/21

1    Morgan Decl. (Dkt. # 154) (redacted) ¶ 3, Ex. 2 ("Corrected Voth Rep.") ¶ 5.)[3]  His

2    practice involves valuation; litigation expert witness services, including proving damages

3    calculations; and other forms of litigation support services.  (*Id.*)  Over the past 29 years,

4    Mr. Voth has testified in numerous arbitrations and trials; authored writings and lectured

5    on damages topics; and has been repeatedly retained as an expert on commercial

6    damages.  (*Id.*)  Summit retained Mr. Voth as a damages expert to analyze economic

7    damages and to rebut Philips's damages expert, Dr. Kennedy.  (*Id.* ¶ 1.)

8          Mr. Voth challenges various aspects of Dr. Kennedy's report.  First, he concludes

9    that Dr. Kennedy did not present "a nexus between the alleged wrongful acts and

10   [Summit's] profits."  (*Id.* ¶ 3(a); *see also id.* ¶ 35 ("I have seen no evidence, and none are

11   presented in the Kennedy Report, that particular sales are specifically attributable to, or

12   generated because of, the alleged wrongful acts.").)  Second, Mr. Voth believes that Dr.

13   Kennedy overstates both the relevant revenues and the profit margin.  (*Id.* ¶¶ 3(b)-(c).)

14   Mr. Voth then takes issue with how Dr. Kennedy "[made] no attempt to apportion

15   [Summit's] profits between the alleged wrongful acts and all of the other products and

16   services contributing to the revenues generated by Summit."  (*Id.* ¶ 3(d); *see also id.* ¶ 44

17   ("[T]he Kennedy Report makes no attempt to prove or calculate profits attributable to the

18   alleged wrongful acts.").)

19         Lastly, Mr. Voth disagrees with Dr. Kennedy's avoided cost calculations and the

20   underlying source code analysis by Dr. Sorini.  (*Id.* ¶¶ 3(f), 62.)  Mr. Voth criticizes that

21

22         [3] The report is separately filed under seal as Exhibit 2 to Ms. Morgan's declaration. (*See* Exs. 1-6 (Dkt. # 155).)

1   "[n]o attempt has been made to separate different functions within the claimed lines of

2   code" and characterizes the COCOMO-II model as "a black box" that "cannot be

3   evaluated" because it does not identify how the lines of code are generated and requires

4   too many assumption inputs.  (*Id.* ¶¶ 62(b), (d), (g).)  Mr. Voth qualifies Dr. Sorini's

5   estimation of ██████ person-months as "astronomical" without Philips having produced

6   "actual costs records for even a single hour relating to generating the code."  (*Id.* ¶ 62(f).)

7        Mr. Voth drew his own conclusions regarding Summit's damages after reviewing

8   various reports and discovery documents, as well as speaking to Summit personnel and

9   counsel.  (*See, e.g.*, *id.* ¶ 7, Ex. 2.)  Mr. Voth concludes that "it cannot be shown that

10  Summit's activities relating to the alleged wrongful enabling of other licensed options

11  contributed to any sales relating to transducers," and thus, Summit was not unjustly

12  enriched.  (*Id.* ¶¶ 37-38.)  He also calculated Summit's profit apportionment using "cost

13  inputs" by looking at how much time Summit's personnel spent engaging in the alleged

14  improper activities.  (*Id.* ¶ 51.)  To do so, he requested Mr. Nguyen to "oversee a

15  timekeeping exercise for a representative workweek for the personnel engaged in the

16  alleged wrongful activities in order to understand the resources required by Summit to

17  perform those activities versus other activities."  (*Id.*)  Mr. Voth explains that this

18  exercise "is a reasonable apportionment of time and, by extension, value to the

19  contributions of the alleged wrongful activities versus other activities . . . leading to the

20  receipt of revenues and profits."  (*Id.*)

21       Using the reported timekeeping, Mr. Voth initially concluded that "Summit's

22  employees spend little time in relation to the activities associated with Summit's alleged

1    wrongful conduct." (4/5/21 Morgan Decl. ¶ 2, Ex. 1 ("Voth Rep.") ¶ 52.)  He then

2    calculated the total annual costs of labor related to alleged wrongful activities, and along

3    with supply and equipment costs, concluded that Summit's annual variable cost

4    associated with the alleged wrongful activities totaled ███████.  (*Id.* ¶¶ 53-54.)

5    Comparing that to Summit's total variable costs of ███████, Mr. Voth concludes that

6    the costs attributable to the alleged wrongful activities represent 1.28 percent of total

7    variable costs.  (*Id.* ¶ 54.)  Thus, Mr. Voth opines that any damages associated with

8    Summit's profits must be multiplied by this apportionment percentage.  (*Id.*)

9        After his deposition, where Mr. Voth was questioned about the time recorded, he

10   spoke with Mr. Nguyen and learned that the time tracked was not "all time recorded by

11   employees while working at a [Philips] test bed" but instead only time spent "working at

12   a test bed when using onboard test bed diagnostics or Adepto." (4/5/21 Morgan Decl.

13   ¶ 4, Ex. 3 ("Corrected Rep. Letter") at 1.)  Because of this misunderstanding, Mr. Voth

14   performed a new apportionment analysis that "includes time contemporaneously recorded

15   by Summit's employees associated with any activity that may have involved the use of

16   the test beds" to form a "conservative upper bound of the apportionment ratio of the

17   value attributable to the alleged wrongful activity." (*Id.* at 2.)  This new calculation

18   "increased the upper bound of [the] apportionment analysis from 1.28 percent to 9.26

19   percent." (*Id.*; *see also* Corrected Voth Rep. ¶ 53, 56.)

20   **D.    Stephen L. Grimes**

21       Mr. Grimes is a Principal Consultant at Strategic Healthcare Technology

22   Associates, LLC, and has more than 45 years of experience in the fields of healthcare

1   technology management ("HTM") services and clinical engineering.  (4/6/21

2   Wirtschafter Decl. (Dkt. # 150) (redacted) ¶ 1, Ex. A at Ex. 112 ("Grimes Rep.") ¶ 3.)[4]

3   HTM professionals, which include clinical engineers, manage the "selection, deployment,

4   support and maintenance of medical devices and systems" in healthcare settings.  (*Id.*

5   ¶ 27.)  Mr. Grimes has managed HTM services at numerous healthcare facilities.  (*Id.*

6   ¶ 3.)  He has additionally served as the chair of professional accreditation entities that

7   certify HTM professionals.  (*See id.* ¶¶ 6-7.)  Mr. Grimes has been recognized with

8   numerous awards in the HTM field, including being inducted into the American College

9   of Clinical Engineering's ("ACCE") Clinical Engineering Hall of Fame.  (*Id.* ¶ 11; *see*

10  4/6/21 Wirtschafter Decl. ¶ 1, Ex. A at Ex. 110 ("Grimes CV") at 6.)

11       Summit retained Mr. Grimes to provide "expert opinions in the field of [HTM]

12  and clinical engineering" on the following questions:

13   - Do ISOs generally provide repair and service on medical devices that
        is inferior in quality to that provided by OEMs such as Philips?
14   - Does service of medical devices by ISOs instead of OEMs create a
        safety risk to patients?
15   - Do Summit's repair services of diagnostic ultrasound imaging
        systems and components meet industry accepted quality standards?
16   - If ISOs like Summit are unable to have access to Service Tools needed
17      to repair and service Philips diagnostic ultrasound systems, how
        would that affect the public interest, namely, the quality of healthcare
        and patient outcomes?

18  //

19  //

20  //

21       [4] Mr. Grimes's report is attached as Exhibit 112 to his deposition testimony, which is
22  attached as Exhibit A to Ms. Wirtschafter's declaration.  (*See* 4/6/21 Wirtschafter Decl. ¶¶ 1-2.)
    The deposition testimony and report are separately filed under seal.  (*See* Ex. A (Dkt. # 151).)

1    (Grimes Rep. at 1, ¶ 21.)  To answer these questions, Mr. Grimes relied on his experience

2    in HTM management, various documents and articles regarding the industry, and an

3    interview with Mr. Nguyen.  (*Id.* ¶ 23.)

4         Mr. Grimes notes that from his experience, "many major medical equipment

5    manufacturers have consistently resisted requests . . . for Service Information" and that

6    "Philips is generally considered to be one of the most restrictive."  (*Id.* ¶¶ 54, 57.)  He

7    observes that many OEMs, including Philips, have pushed for more regulation of ISOs

8    and resisted legislation that would mandate more sharing of information, citing concerns

9    regarding ISO quality.  (*Id.* ¶¶ 37, 58-62, 65, 68-69.)  However, Mr. Grimes concludes

10   there is "no objective evidence that ISO maintenance is generally inferior in quality" or

11   that ISO services "present an increase in risk to patient safety."  (*Id.* ¶ 22.)  He concludes

12   that Summit's services "meet the gold standard of industry quality, namely, ISO 13485

13   Medical devices – Quality Management Systems and have met them since 2015."  (*Id.*)

14   Lastly, Mr. Grimes opines that if Summit and other ISOs were unable to access Service

15   Tools, "the public interest would be negatively affected by reducing service options

16   available to hospitals leaving them with potentially inferior alternatives."  (*Id.*)

17        In his deposition, Mr. Grimes testifies that his conclusions regarding the first two

18   questions are general.  (4/6/21 Wirtschafter Decl. ¶ 1, Ex. A ("Grimes Dep.") at

19   136:12-25; 166:8-24; 167:3-168:6.)  Regarding Summit's quality of services, Mr. Grimes

20   states that he reviewed records, including the ISO 13485 standard and independent audits,

21   but did not independently verify that Summit was meeting those standards.  (*Id.* at

22   195:14-200:2; 209:20-210:3.)  He further notes that when considering the public interest,

ORDER - 10

1   his understanding of Summit's Adepto software came largely from his conversation with

2   Mr. Nguyen and publicly available videos; he did not personally inspect or observe

3   Adepto's functionality.  (*Id.* at 98:10-100:7.)

4   **E.     Dr. Aviel D. Rubin**

5          Dr. Rubin is currently a Professor of Computer Science at Johns Hopkins

6   University.  (Detrixhe Decl. (Dkt. # 152 (redacted)) ¶ 3, Ex. K ("Rubin Rep.") ¶ 4.)[5]  He

7   has 22 years of experience in computer science, specifically in Internet and computer

8   security.  (*Id.* ¶ 2.)  Dr. Rubin spoke on information security at more than 50 events as

9   well as testified before Congress on technology security.  (*Id.* ¶¶ 9-11.)  Dr. Rubin is

10  Summit's technical expert and reviewed Philips's ultrasound system software.  Dr. Rubin

11  makes various conclusions regarding the copyrightability of Philips's technology and the

12  scope of Philips's copyright.  (*See id.* ¶¶ 17-23, 71, 82, 84, 88, 91, 94, 102; Detrixhe

13  Decl. ¶ 4, Ex. L ("Supp. Grimes Rep.") ¶ 144.)

14         Having summarized the expert testimonies at issue, the court now addresses the

15  motions to exclude.

16                            **III.      ANALYSIS**

17         Rule 702 of the Federal Rules of Evidence governs the admission of expert

18  testimony:

19         A witness who is qualified as an expert by knowledge, skill, experience,
           training, or education may testify in the form of an opinion or otherwise if:

20

21

22         [5] The report is filed under seal as exhibit K to Ms. Wirtschafter's declaration in support
    of Philips's motion for summary judgment.  (*See* Ex. K (Dkt. # 164).)

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires that the expert be qualified and that the "'[e]xpert testimony . . . be both relevant and reliable.'" *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)); Fed. R. Evid. 702. Relevancy "simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'" *Est. of Barabin*, 740 F.3d at 463 (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).

Reliability requires the court to assess "whether an expert's testimony has a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)) (internal citations and alterations omitted). The Supreme Court has suggested several factors to determine reliability: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993). The reliability inquiry is flexible, however, and trial judges have broad latitude to focus on considerations relevant to a particular case. *See Kumho Tire*, 526 U.S. at 150.

In determining reliability, the court considers the soundness of the expert's

1    methodology, *Est. of Barabin*, 740 F.3d at 463, and the analytical connection between the

2    data, methodology, and expert conclusions, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

3    (1997); *see also Cooper*, 510 F.3d at 942 (requiring that "expert testimony relate to

4    scientific, technical or other specialized knowledge," not "unsubstantiated speculation

5    and subjective beliefs"); Fed. R. Evid. 702 Advisory Committee's Notes to 2000

6    Amendments ("[T]he testimony must be the product of reliable principles and methods

7    that are reliably applied to the facts of the case.").  The court should not rule on the

8    correctness of the expert's conclusions.  *Est. of Barabin*, 740 F.3d at 463.  "[T]he

9    proponent of the expert . . . has the burden of proving admissibility."  *Cooper*, 510 F.3d

10   at 942 (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

11           Both parties raise a myriad of arguments against the challenged experts, and the

12   court addresses each expert in turn.

13   **A.     Dr. Adam Sorini**

14           Summit argues that Dr. Sorini's count of source code and corresponding

15   calculation of effort to produce that code—which underline Philips's avoided

16   development costs damages analysis—are not relevant because they "are not tied to the

17   features, functions, and trade secrets allegedly used by Summit."  (MTE Sorini &

18   Kennedy at 6-7.)  Philips responds that at best, Summit's concerns go to the weight and

19   not the admissibility of Dr. Sorini's avoided development cost opinion.  (MTE Sorini &

20   Kennedy Resp. at 6.)  The court agrees with Philips.

21           Courts have "broad latitude in fashioning appropriate remedies" in trade secrets

22   cases, and thus, "courts have considerable leeway in calculating a damage award for trade

1   secrets theft." *Litton Sys., Inc. v. Ssanyong Cement Indus.*, No. C-89-3832 VRW, 1993

2   WL 317266, at *1 (N.D. Cal. Aug. 19, 1993).  In trade secret misappropriation cases,

3   avoided research and development costs have been recognized as one way to measure the

4   benefit conferred on the defendant.  *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980

5   F.3d 1117, 1130 (7th Cir. 2020) ("[A]voided research and development costs have been

6   awarded when the defendants gained a significant head start in their operations.").

7   Summit does not contest the relevance or reliability of avoided development costs but

8   insists that Dr. Sorini's approach is irrelevant because it focused entirely on Philips' costs

9   rather than what Summit actually used.  (*See* MTE Sorini & Kennedy at 6-10.)

10          Contrary to Summit's contentions, courts have approved of avoided costs analyses

11   that are based on the plaintiff's development costs rather than the defendant's actual use.

12   For instance, in *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003), the Ninth

13   Circuit upheld a damages award that was based on the infringee's development cost to

14   produce the protected material.[6]  *Id.* at 709-10.  Similarly, in *InfoDeli, LLC v. Western*

15   *Robidoux, Inc.*, No. 4:15-CV-00364-BCW, 2020 WL 1855298 (W.D. Miss. Mar. 16,

16   2020), the court found an expert's "estimates of the costs to develop software" to be

17   "potentially helpful to the jury," even though the opinion was "not linked to any conduct

18   _____

19          [6] Summit contends this case used "defendant's own research and development" costs
     whereas Philips maintains that "the plaintiff's research and development" costs were used.
20   (MTE Sorini & Kennedy Reply (Dkt. # 298) at 6; MTE Sorini & Kennedy Resp. at 6.)  This
     confusion may stem from the fact that the individual providing the development costs was an
     employee of both the plaintiff and the defendant.  *See Bourns*, 331 F.3d at 706-07.  Additionally,
21   although Raychem is listed as the defendant, it brought the misappropriations case against
     Bourns, thus further muddling who is the plaintiff.  *Id.* at 707.  The court reads the case as
22   accepting the individual's development experience while working for Raychem, the "plaintiff,"
     as that is where he developed the proprietary information at issue.  *See id.* at 707, 709.

of [defendants]." *Id.* at *1.  Courts generally agree that arguments about the extent to which the defendant actually used or benefitted from proprietary information are "matters for cross examination." *See, e.g.*, *Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*, No. Civ.A 01-669-KAJ, 2004 WL 1534786, at *3 (D. Del. May 21, 2004).

*Syntel Sterling Bet Shores Mauritius Limited v. TriZetto Group*, 15 Civ. 211 (LGS), 2020 WL 5822058 (S.D.N.Y. Sept. 30, 2020), is instructive here.  The alleged infringer Syntel moved to exclude expert testimony regarding damages that it argued lacked "empirical basis" because "the calculations assume Syntel misappropriated trade secrets covering all [protected] development costs, without [the expert's] knowing what alleged trade secrets were misappropriated and how they were used." *Id.* at *1-2. However, the court found that the expert sufficiently tied his conclusions to Syntel's alleged use, because he cited another expert's analysis and his report provided "facts to support how Syntel used the alleged trade secrets at issue." *Id.* at *2.  Accordingly, the court concluded that Syntel's concerns, which "boil[ed] down to a dispute over the extent of misappropriation," is "an issue for cross-examination at trial." *Id.*

The same is true for Dr. Sorini.  Summit argues that Dr. Sorini's source code count "of the entire ultrasound service software" is an inaccurate proxy for Summit's alleged use.  (MTE Sorini & Kennedy at 7.)  But like the expert in *Syntel*, Dr. Sorini's report analyzed both Philips's and Summit's technologies and reached conclusions regarding Summit's "methods for accessing materials Philips contends are trade secrets." (Sorini Rep. ¶¶ 308-43); *see* 2020 WL 5822058 at *2.  These facts sufficiently tie Dr. Sorini's conclusions to Summit's use and distinguish this case from *Epic Systems Corporation v.*

1    *Tata Consultancy Services Limited*, where there was a "complete lack of evidence tying

2    the costs of [the plaintiff's] research and development efforts to any commensurate

3    benefit to defendant."  *See* No. 14-cv-748-wmc, 2016 WL 1366579, at *2 (W.D. Wis.

4    Apr. 14, 2016).  Thus, Dr. Sorini's analysis is not "so devoid of fit or reliability as to be

5    inadmissible," and Summit's concerns can be adequately addressed on cross examination.

6    *See Callaway*, 2004 WL 1534786, at *3; *see also GlobeRanger Corp. v. Software AG*

7    *U.S. of Am., Inc.*, 836 F.3d 477, 500 (5th Cir. 2016) (qualifying similar concerns as

8    "go[ing] to the weight a factfinder should give the testimony").

9         Summit next argues that Dr. Sorini's count is overly prejudicial because it requires

10    Summit to "prove its innocence by showing its non-use of Philips's source code."  (MTE

11    Sorini & Kennedy at 10.)  The court is unpersuaded.  Under Federal Rule of Evidence

12    403, the court may exclude evidence if "its probative value is substantially outweighed by

13    . . . unfair prejudice."  Fed. R. Evid. 403.  Summit makes no argument on how the unfair

14    prejudice it would allegedly suffer would "substantially outweigh[]" the probative value

15    of Dr. Sorini's conclusions (*see* MTE Sorini & Kennedy at 9-10), and any prejudice is

16    diminished by Summit's ability to present its own expert and to cross-examine Dr. Sorini.

17    Thus, the court concludes that any unfair prejudice does not substantially outweigh the

18    probative value such that exclusion is warranted.  *See* Fed. R. Evid. 403.

19         In sum, Dr. Sorini's expert testimony on avoided costs is both relevant and

20    reliable.  *See Est. of Barabin*, 740 F.3d at 463.  Accordingly, the court denies Summit's

21    motion to exclude this portion of Dr. Sorini's testimony.

22    *//*

**B.     Dr. Patrick Kennedy**

Summit next challenges Dr. Kennedy's avoided costs analysis for relying on Dr. Sorini's flawed code count.  (MTE Sorini & Kennedy at 9.)  At oral argument, Summit confirmed that it has no independent reason for excluding Dr. Kennedy's testimony.  (*See id.* ("Dr. Kennedy's avoided cost analysis, which is based on Dr. Sorini's flawed analysis, should be struck for the same reason.").)  The court has found Dr. Sorini's analysis to be admissible, and that analysis applies equally to Dr. Kennedy's conversion of the person-months into a monetary value.  *See supra* § III.A.  Thus, the court denies Summit's motion to exclude the avoided costs portion of Dr. Kennedy's testimony.

**C.     Drew Voth**

Philips challenges three aspects of Mr. Voth's expert testimony.  First, Philips argues that Mr. Voth's apportionment analysis is the product of unreliable principles and methods.  (MTE Voth at 5-7.)  Second, Philips takes issue with improper legal conclusions on liability and causation and opinions that "parrot Defendants' theories and assertions that they are not liable."  (*Id.* at 7-10.)  Third, Philips contends that Mr. Voth "goes beyond his expertise" in criticizing Drs. Sorini and Kennedy's avoided cost analysis.  (*Id.* at 10-12.)  Summit additionally filed a surreply to strike portions of Philips's reply and accompanying supporting material.  (Surreply at 1.)  The court addresses Summit's surreply before turning to each of Philips's arguments.

1.   Summit's Surreply

Pursuant to Local Civil Rule 7(g), Summit moves to strike a footnote in Philips's reply brief that claims:

1    [Mr.] Voth's causation opinions are also unhelpful because they ignore
2    [Summit's] failure to preserve records of [its] wrongful conduct that are
     relevant to the causation issue. Philips only recently became aware of this
3    incomplete evidentiary record and it is addressed, in part, in Dr. Sorini's
     supplemental report.

4    (MTE Voth Reply (Dkt. ## 220 (sealed), 221 (redacted)) at 5 n.2; *see* Surreply at 1.)

5    Summit takes issue with both the footnote and the corresponding material in Dr. Sorini's

6    supplemental report. (Surreply at 1.)

7         "New arguments may not be introduced in a reply brief," *United States v. Puerta*,

8    982 F.2d 1297, 1300 n.1 (9th Cir. 1992), and a court "need not consider arguments raised

9    for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

10   If new facts or arguments are introduced, the nonmoving party may file a surreply

11   requesting that the court strike the material. Local Rules W.D. Wash. LCR 7(g). As

12   Philips acknowledged during oral arguments, it argues for the first time on reply, with Dr.

13   Sorini's supplemental report as support, that Summit failed to preserve records. (*See*

14   MTE Voth Reply at 5, n.2; *see generally* MTE Voth.) Because this argument and

15   evidence were not raised until Philips's reply, the court will not consider them and strikes

16   the portion of this footnote advancing this new argument.

17        However, Summit also asks to exclude, as a discovery sanction, the new portions

18   of Dr. Sorini's supplemental report, which it purports was untimely disclosed. (*See*

19   Surreply at 1-3 (analyzing Federal Rule of Civil Procedure 37(c)).) That is not the

20   purpose of a surreply. Local Rules W.D. Wash. LCR 7(g) (qualifying surreply as

21   "strictly limited to addressing" "requests to strike material contained in or attached to a

22   reply brief"). Summit did not move to exclude Dr. Sorini's supplemental report (*see*

1   MTE Sorini & Kennedy) or move separately for discovery sanctions (*see* Dkt.).[7]

2   Couching such a motion in its surreply to a motion to exclude an entirely different expert

3   is improper.  *See* Local Rules W.D. Wash. LCR 7(g).  Thus, the court does not consider

4   this request to exclude under Federal Rule of Civil Procedure 37(c).

5       2.  Apportionment Analysis

6       Having decided what materials are properly before it, the court now turns to the

7   merits of Philips's motion.  Philips argues that Mr. Voth's apportionment analysis is

8   "novel and unreliable" because his methodology "has no relationship to the value a

9   defendant unjustly gains by wrongfully using intellectual property."  (MTE Voth at 5.)  In

10  particular, Philips challenges how Mr. Voth utilizes "a ratio of variable costs associated

11  with wrongful activities divided by total variable costs to apportion Defendants' profits."

12  (*Id.*)  The court agrees and thus excludes this portion of Mr. Voth's testimony.

13      "When an infringer's profits are attributable to factors in addition to use of

14  plaintiff's work, an apportionment of profits is proper."  *Frank Music Corp. v.*

15  *Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985).  Traditionally, the

16  plaintiff has the burden of establishing the defendant's sales, and the defendant then "has

17  the burden of establishing any portion of the sales not attributable to the trade secret."

18  *Petters v. Williamson & Assocs., Inc.*, 210 P.3d 1048, 1054 (Wash. App. Ct. 2009).

19  "[A]ny reasonable approximation [of apportionment] must be based on a methodology

20  //

21      ───────────────

22      [7] The court recognizes that Summit raises the same argument to exclude Dr. Sorini's supplemental report in its opposition to Philips's motion for partial summary judgment.  (*See* Pls. MSJ Resp. at 34-36 (Dkt. ## 229 (sealed), 230 (redacted)).)

1    that is tied to the goal of estimating the profits that [the defendant] actually earned due to

2    its use of the allegedly infringing [material]." *Oracle Am. Inc. v. Google Inc.*, No. C

3    10-03561 WHA, 2016 WL 1743154, at *3 (N.D. Cal. May 2, 2016).  For instance, the

4    expert in *Oracle* apportioned profits by applying the percentage of the overall codebase

5    that the allegedly infringing code encompassed.  *See id.* at *2.

6          Summit purports that Mr. Voth applied the cost approach to valuation of

7    intellectual property, but a look at Summit's own cited authority shows otherwise.  (*See*

8    MTE Voth Resp. at 5.)  Cost approach methods "are based on the economics principle of

9    substitution"; thus, all cost approach methods estimate value "by the cost to create a new

10   substitute intellectual property."  L.M. Brownlee, *Intellectual Property Due Diligence in*

11   *Corporate Transactions* § 12:9 (Apr. 2021); *see also id.* § 12:10 (discussing cost

12   approach valuation methods).  In other words, a cost approach "bases value on the cost to

13   replace the subject asset and develop an alternative asset of acceptable utility."  *Miller*

14   *UK Ltd. v. Caterpillar, Inc.*, No. 10-cv-03770, 2015 WL 10818831, at *13 (N.D. Ill. Nov.

15   1, 2015).  Reviewing the cost of replacement or development of an alternative asset is not

16   what Mr. Voth did.  (*See* Voth Rep. ¶¶ 50-57.)  Summit conceded as much in oral

17   argument, noting that Mr. Voth did not apply a traditional cost approach but instead

18   adapted it to an apportionment context.

19         In his analysis, Mr. Voth assumes that the ratio of variable costs spent on the

20   alleged wrongful activity to Summit's total variables is "reasonably equal" to the ratio of

21   revenues associated with alleged wrongdoing to total revenues.  (MTE Voth at 6

22   (assuming Summit applies same markup of costs to revenues for all activities).)  But

neither Mr. Voth nor Summit explains why that key assumption is true here.  (*See id.*
(providing no citation for this assumption); Voth Rep. ¶¶ 50-57; 4/5/21 Morgan Decl. ¶ 6,
Ex. 5 ("3/17/21 Voth Dep.") at 203:3-04:3 (discussing hypothetical where employee
could have brought in more revenue with Philips software while spending less time on
task).)  Nor does Mr. Voth explain why labor apportionment—that is, looking at the
percentage of time employees spent using the alleged infringed technology—has any
connection to what portion of Summit's profits came from its alleged access to that
technology, especially as Mr. Voth admits, Summit "has no way to track or identify
which particular revenues are associated with particular operations."  (*See* 4/5/21 Morgan
Decl. ¶ 7, Ex. 6 ("3/26/21 Voth Dep.") at 68:20-24.)  Tellingly, Mr. Voth could not name
another case where he has performed a time study like this one to apportion profits; nor
could he provide any peer-reviewed publications that approved of a time study
methodology to apportion profits in a trade secret case.  (3/17/21 Voth Dep. at 206:7-13,
207:7-14.)  Summit similarly fails to provide examples in its briefing, and, at oral
argument, admitted that it is not aware of any case where Mr. Voth's methodology passed
muster under *Daubert*.  (*See generally* MTE Voth Resp.)

　　　　Summit provides one copyright case, *Indigo Grp. USA, Inc. v. Polo Ralph Lauren
Corp.*, No. CV 11-05883 MWF (CWx), 2017 U.S. Dist. LEXIS 210470 (C.D. Cal. Dec.
20, 2017), in which the plaintiff was found to be a joint owner of certain "cut and sew"
patterns.  *See id.* at *19.  To determine damages, a special master utilized labor and cost
apportionment to apportion profits.  *Id.* at *5, *18.  But *Indigo Group* did not involve
expert testimony under Rule 702, and the court did not perform its *Daubert* gatekeeping

1    function.  *See id.*  Thus, while the court adopted the special master's calculations, that

2    does not mean that the methodology would have passed muster under Rule 702.  Indeed,

3    the case dealt with "an accounting of profits," which is "governed by state law

4    accounting principles," not copyright or trade secrets law.  (4/23/21 Morgan Decl. (Dkt.

5    # 222) ¶ 3, Ex. 2 (*Indigo Group* minute order describing accounting).)

6         At oral argument, Summit provides another case in the bankruptcy context

7    describing an "Apportionment Based on Cost" method that "apportions profits based on

8    the cost or price of a component compared to the cost of the entire multi-component

9    product." *In re Avaya Inc.*, No. 17-10089 (SMB), 2018 Bankr. LEXIS 1209, at *23

10   (Bankr. S.D.N.Y. Apr. 23, 2018) (citing AICPA Practice Guide § 2.4.6.2.1).  Again, the

11   court did not perform a *Daubert* analysis.  *See id.*  But more importantly, Mr. Voth did

12   not estimate the cost of Philips's technology as compared to the cost of Summit's entire

13   servicing product; instead, he estimated the cost of Summit's labor using Philips's

14   technology without any evidence that labor is an accurate representation of the

15   technology's value to Summit's business.  *See id.* at *27 (noting that "[c]ost-based

16   apportionment is inappropriate if the cost of some elements may not represent their

17   value"); (*see* Voth Rep. ¶¶ 50-57).  Thus, even accepting Summit's reliance on *In re*

18   *Avaya*, it does not render Mr. Voth's specific analysis here reliable.

19        Compounding the unsoundness of Mr. Voth's methodology are the questions

20   surrounding his underlying data.  "Opinions derived from erroneous data are

21   appropriately excluded." *Smith v. Pac. Bell Tel. Co., Inc.*, 662 F. Supp. 2d 1199, 1226

22   (E.D. Cal. 2009).  Here, Mr. Voth's labor apportionment analysis relied largely on a

1    "timekeeping exercise" that he asked Mr. Nguyen to perform for a week, the results of

2    which have already been misinterpreted once.  (Corrected Voth Rep. ¶ 51; Corrected Rep.

3    Letter at 1.)  Mr. Voth has no expertise in designing or conducting timekeeping studies.

4    (*See* Corrected Voth Rep., Ex. 1.)  Instead, he asked Mr. Nguyen to record all time

5    "relate[d] to the alleged unlawful activities" but did not define what qualified as "alleged

6    unlawful activities" and did not provide any written instructions or examples of what

7    activities to capture.  (3/26/21 Voth Dep. at 9:18-23, 10:11-21, 13:21-25, 14:11-15.)  He

8    has no "direct knowledge" of how Mr. Nguyen instructed employees or whether

9    employees accurately recorded their time.  (3/17/21 Voth Dep. at 188:4-16.)  He relied

10   completely on Mr. Nguyen's representations in his examination of timesheets and did not

11   independently verify those representations.  (3/26/21 Voth Dep. at 35:1-11.)

12          Taken cumulatively, Mr. Voth's apportionment analysis is unreliable.  Mr. Voth's

13   apportionment methodology is not sufficiently "tied to the goal of estimating the profits

14   that [the defendant] actually earned due to its use of the allegedly infringing [material],"

15   *see Oracle*, 2016 WL 1743154, at *3, and there are additional concerns regarding its

16   underlying data.  Accordingly, the court excludes this portion of Mr. Voth's expert

17   testimony.  *See Est. of Barabin*, 740 F.3d at 463.

18          3.  Liability, Causation and Defendant Theories

19          Philips next challenges several of Mr. Voth's statements as unhelpful to the jury

20   because they are improper legal conclusion or conduits for hearsay.  (MTE Voth at 7-10.)

21   First, Philips challenges Mr. Voth's criticisms of Dr. Kennedy's report and his own

22   conclusion that none of Summit's profits can be associated with the alleged wrongful

1   activity as improper legal conclusions.  (*Id.* at 7-9.)  Second, Philips identifies opinions

2   that "parrot [Summit's] theories and assertions that they are not liable for certain conduct

3   or revenues."  (*Id.* at 9-10.)  The court disagrees.

4        Expert opinions are not objectionable merely because they embrace an ultimate

5   issue.  Fed. R. Evid. 704(a).  However, "an expert witness cannot give an opinion as to

6   her legal conclusion, i.e., an opinion on an ultimate issue of law."  *Nationwide Transp.*

7   *Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  However, as a damages

8   expert, Mr. Voth may testify to what profits were attributable to the alleged infringement,

9   which is an issue of fact.  (Corrected Voth Rep. ¶ 37); *see Stone Brewing Co., LLC v.*

10  *MillerCoors LLC*, No.: 3:18-cv-00331-BEN-LL, 2020 WL 907060, at *5 (S.D. Cal. Feb.

11  25, 2020).  Thus, Mr. Voth's testimony will "aid the jury in understanding the facts in

12  evidence"—namely Summit's profits and what they can be attributed to—even through

13  his "reference to those facts is couched in legal terms," such as "unjust enrichment."  *See*

14  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

15  Nor are his criticisms of Dr. Kennedy's analysis improper conclusions of law.  *See In re*

16  *Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) (allowing rebuttal

17  witness to "point out flaws in [expert's] methodologies or conclusions").

18       The court similarly declines to exclude the portions of Mr. Voth's testimony

19  where he relates his understanding of Summit's position.  "[T]rial courts can screen out

20  experts who would act as mere conduits for hearsay by strictly enforcing the requirement

21  that experts display some genuine 'scientific, technical, or other specialized knowledge.'"

22  *Williams v. Illinois*, 567 U.S. 50, 80 (2012).  Thus, when expert testimony "consist[s]

1    entirely of relaying hearsay," the opinion is "not helpful to the jury" because it is "overly

2    reliant on hearsay."  *United States v. Hendrix*, No. CR19-0024JLR, 2020 WL 30342, at

3    *5 (W.D. Wash. Jan. 2, 2020).  However, experts "may certainly rely on hearsay and

4    relay it to the jury under appropriate circumstances."  *Id.*  If an expert "is applying his

5    training and experience to the sources before him and reaching an independent

6    judgment," then the opinion is not a conduit for hearsay.  *United States v. Prichard*, 692

7    F. App'x 349, 351 (9th Cir. 2017) (quoting *United States v. Gomez*, 725 F.3d 1121, 1129

8    (9th Cir. 2013)) (internal quotation marks and alterations omitted).

9         Here, although Mr. Voth relays information that he learns from Summit and

10   Summit's counsel, he states those as the underlying information and assumptions that his

11   analysis builds upon.  (*See, e.g.*, Corrected Voth Rep. ¶ 39 (stating information learned

12   from Summit to explain scope of analysis).)  Thus, his testimony does not "consist

13   entirely of relaying hearsay."  *See Hendrix*, 2020 WL 30342, at *5.  Indeed, if he had not

14   stated his assumptions, Philips may well have grounds to challenge his analysis as

15   unreliable.  To the extent Philips takes issue with Mr. Voth's assumptions as improper,

16   "the accuracy of [the expert's] assumptions" goes to weight not admissibility, and Philips

17   is free to cross-examine Mr. Voth on the issue.  *See Oracle*, 2016 WL 1743154, at *8.

18        4.  Avoided Cost Criticism

19        Lastly, Philips challenges Mr. Voth's critique of Dr. Kennedy's avoided cost

20   calculations and the "astronomical" results of the COCOMO-II model.  (VTE Voth at

21   10-12.)  First, Philips pinpoints two statements where Mr. Voth criticizes Dr. Kennedy's

22   analysis because "[n]o attempt has been made to separate different functions within the

1    claimed lines code" and where Mr. Voth reiterates his understanding of Dr. Rubin's

2    expert testimony.  (*Id.* at 11 (quoting Corrected Voth Rep. ¶ 62(b), (h).)  Second, Philips

3    identifies several statements where Mr. Voth characterizes the COCOMO-II model as

4    "effectively a black box" that produced an "astronomical" result here.  (*Id.* (quoting

5    Corrected Voth Rep. ¶ 62(d), (f).)  He further criticizes the assumption inputs of the

6    COCOMO-II model.  (*Id.* (citing Corrected Voth Rep. ¶ 62(g).)

7           The court admits the former category of statements but excludes the latter as

8    outside Mr. Voth's expertise.  Mr. Voth, as a rebuttal expert, may "point out flaws in [the

9    expert's] methodologies," *see In re Toyota*, 978 F. Supp. 2d at 1069, and he may rely on

10   other expert testimonies for his analysis, *see Fed. Trade Comm'n v. Amazon.com, Inc.*,

11   No. C14-1038JCC, 2016 WL 1221654, at *3 (W.D. Wash. Mar. 29, 2016).  However,

12   Mr. Voth is not a technical expert, nor does he have any experience working with the

13   COCOMO-II model.[8]  (*See* 3/17/21 Voth Dep. at 213:6-18 (conceding he "[hasn't]

14   utilized [the COCOMO-II model] . . . in any of [his] calculations").)  Thus, his testimony

15   regarding the COCOMO-II model falls outside his expertise.  *See Smith*, 662 F. Supp. 2d

16   at 1225 (excluding GPS expert's opinion about dismissal of employee because of expert's

17   "lack of expertise and experience with respect to [this] subject matter").  The court

18   concludes Mr. Voth's testimony regarding the COCOMO-II model is inadmissible.

19

20          [8] Summit conceded as much in oral argument when asked about Mr. Voth's qualifications
     with the COCOMO-II model.  Rather than providing any qualifications, Summit pivoted and
21   attacked Dr. Kennedy as equally unqualified with the COCOMO-II model.  But, as Summit
     acknowledges, it did not file a motion to exclude Dr. Kennedy's testimony on that ground;
22   moreover, Dr. Kennedy did not opine on the COCOMO-II model as Mr. Voth did.  (*See*
     Kennedy Rep. ¶¶ 100-13.)

1    **D.      Stephen L. Grimes**

2         Philips next challenges the admissibility of Mr. Grimes's testimony.  (*See* MTE

3    Grimes.)  Summit posed four questions to Mr. Grimes (Grimes Rep. ¶ 21), and Philips

4    moves to exclude all four opinions on varying grounds (*see* MTE Grimes at 5-12).  The

5    court reviews these opinions in turn.

6         1.  Questions 1 and 2:  Quality and Risk of ISO Services

7         Philips first attacks the relevancy of Mr. Grimes's opinions regarding the quality

8    and safety risks of ISOs.  (*See id.* at 5-7.)  Philips contends that these opinions, which are

9    not focused on Summit, are so generalized that they will not assist the jury.  (*Id.*)

10   Although the court agrees with Philips that generally, expert testimony that is

11   unconnected to the case would be, at best, marginally relevant, *see Hendrix*, 2020 WL

12   30342, at *4, the claims here render Mr. Grimes's opinion sufficiently relevant to

13   withstand exclusion.

14        Summit brings a copyright misuse counterclaim.  "Copyright misuse is a judicially

15   crafted affirmative defense to copyright infringement" that prevents "holders of

16   copyrights from leveraging their limited monopoly to allow them control of areas outside

17   the monopoly." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).  The

18   "contours of [this equitable defense] are still being defined." *MDY Indus., LLC v.*

19   *Blizzard Ent., Inc.*, 629 F.3d 928, 941 (9th Cir. 2010).  The motive behind the copyright

20   is relevant to whether the holder improperly leveraged its copyright. *See Omega S.A. v.*

21   *Costco Wholesale Corp.*, No. CV 04-05443 TJH, 2011 WL 8492716, at *2 (C.D. Cal.

22   Nov. 9, 2011), *aff'd on other grounds,* 776 F.3d 692 (9th Cir. 2015) (focusing on fact that

1    "a purpose of the copyrighted [design] was to control the importation and sale of its

2    watches"); *see also Omega*, 776 F.3d at 701 ("By definition, 'use' includes an inquiry

3    into purpose.") (Wardlaw, J., concurring).

4           Mr. Grimes presents evidence that many OEMs have repeatedly pointed to quality

5    of service and patient safety as justifications for not sharing information.  (Grimes Rep.

6    ¶¶ 37, 54, 57-62, 65, 68-69.)  Philips specifically has "questioned the quality of

7    maintenance services provided by ISOs" and the Senior Vice President of Health Systems

8    Solutions for Philips North America testified before Congress on these concerns.  (*Id.*

9    ¶¶ 58, 61.)  In internal training, Philips stresses that ███████████████████████

10   ████████████████████████████████████████████████████ (Levy Decl.

11   (Dkt. # 201) ¶ 7, Ex. E (Dkt. #205 (sealed)) at 6.)  Based on his experience, Mr. Grimes

12   rebuts this purported motive by concluding that there is "no objective evidence that ISO

13   maintenance is generally inferior in quality" or "present[s] an increase in risk to patient

14   safety."  (*Id.* ¶ 22.)  Given the importance of the copyright holder's motive, Mr. Grimes's

15   opinion that Philips's previously stated concerns regarding ISOs are unfounded "logically

16   advance[s] a material aspect of [Summit's] case."  *See Est. of Barabin*, 740 F.3d at 463.

17   Accordingly, the court finds Mr. Grimes's opinions on questions 1 and 2 to be relevant.

18          The court additionally disagrees with Philips that the probative value of these

19   opinions is substantially outweighed by its unfair prejudicial effect and its risk of

20   confusing the jury.  (*See* MTE Grimes at 11-12 (citing Fed. R. Evid. 403).)  Philips will

21   have a chance to cross-examine Mr. Grimes on the generality of his "non-specific

22   opinions," which will minimize any confusion that the jury may have on Mr. Grimes's

1    analysis on this point.  (*See id.* at 11.)  The court does not find that this risk substantially

2    outweighs the probative value of the testimony.  *See* Fed. R. Evid. 403.

3        2.  Question 3:  Summit and Industry Accepted Standards

4            Next, Philips contends that Mr. Grimes's opinion on Summit's quality of service is

5    improper because it "provide[s] no 'scientific, technical, or other specialized

6    knowledge.'"  (MTE Grimes at 7.)  Philips takes issue with the fact that Mr. Grimes

7    relied only on Summit's ISO 13485 certification as the basis for his conclusion.  (*Id.* at

8    7-8.)  Philips maintains that "[t]hese documents . . . speak for themselves, and the trier of

9    fact is equally capable of reading their contents."  (*Id.* at 8.)  The court disagrees.

10           Philips is correct that expert testimony must be directed to "scientific, technical or

11   specialized" knowledge to ensure that "expert witness will not testify about 'lay matters

12   which a jury is capable of understanding and deciding without the expert's help.'"  *In re*

13   *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (quoting *Andrews*

14   *v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)).  However, testimony

15   excluded under this basis usually involves "factual narratives" or "interpretations of

16   conduct or views as to the motivation of parties."  *Id.*  In *Estate of Gonzales v. Hickman*,

17   No. ED CV 05-660 MMM (RCx), 2007 WL 3237727 (C.D. Cal. May 30, 2007), the

18   court excluded expert testimony about whether defendants "participated" in a decision

19   because "[t]here is no doubt that, in their common experience, jurors can determine

20   whether or not a particular individual 'participated' in making a decision."  *Id.* at *3 n.34.

21           Mr. Grimes's opinion on question 3 does not involve such factual conduct;

22   instead, he interprets and provides insight on the ISO 13485 certification, a technical

1    quality standard that jurors "in their common experience" may not be able to understand.

2    *See id.*  In doing so, Mr. Grimes provides background information on what the ISO 13485

3    certification is, how it was developed, its requirements, and the significance of that

4    standard.  (*See* Grimes Rep. ¶¶ 71, 74-78.)  This information is informed by Mr. Grimes's

5    45-year experience in the HTM field.  (*See id.* ¶¶ 23, 79-80.)  Philips's concerns—that

6    Mr. Grimes only relied on one certification and that the certification does not consider

7    copyright laws—go to weight rather than admissibility.  *See Krommenhock v. Post*

8    *Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (qualifying "failure to consider

9    specific issues" as "go[ing] to weight, not admissibility").

10        3.  <u>Question 4:  Public Interest</u>

11        Lastly, Philips challenges Mr. Grimes's opinion on how an injunction would affect

12   the public interest as unreliable because he "relies entirely on statements regarding

13   Adepto's functionality provided by . . . [Mr.] Nguyen" rather than specialized knowledge.

14   (MTE Grimes at 9.)  Additionally, Philips faults Mr. Grimes for not "consider[ing] the

15   intellectual property rights of Philips" in his public interest analysis.  (*Id.*)  Again, the

16   court disagrees that such concerns warrant exclusion.

17        As articulated above, while expert testimony may not "consist entirely of relaying

18   hearsay from sources," experts may "relay it to the jury under appropriate

19   circumstances."  *Hendrix*, 2020 WL 30342, at *5; *see Prichard*, 692 F. App'x at 351

20   (allowing expert to "apply[] his training and experience to the sources before him and

21   reach[] an independent judgment"); *see supra* § III.C.3.  Mr. Grimes does more than

22   repeat conclusions from Mr. Nguyen.  He learned about Adepto from Mr. Nguyen,

1  (Grimes Rep. ¶ 82; Grimes Dep. at 98:10-100:7), but he then evaluated the significance

2  of Adepto in the broader healthcare industry using his understanding of what Philips

3  currently provides (Grimes Rep. ¶ 84), alternatives to Adepto (*id.*), and the significance

4  an injunction may have on hospitals at large (*id.* ¶¶ 86-87).  In other words, Mr. Grimes

5  reached independent judgments by applying his experience as an HTM professional to

6  what he learned from Mr. Nguyen.  *See Prichard*, 692 F. App'x at 351.  These opinions

7  required Mr. Grimes's specialized knowledge concerning the needs of hospitals in

8  servicing their equipment.  Because Mr. Grimes's opinion on question 4 does not "consist

9  entirely of relaying hearsay," the court denies Philips's motion to exclude this portion of

10  his testimony.  *See Hendrix*, 2020 WL 30342, at *5.

11  **E.    Dr. Aviel D. Rubin**

12         Finally, Philips moves to exclude 16 statements within Dr. Rubin's report as

13  improper legal conclusions.  (MTE Rubin at 1-2; MTE Rubin Reply (Dkt. # 225) at 1 n.1

14  (withdrawing challenge to one statement).)  Summit responds that it "does not intend to

15  use" any of these statements and signals its willingness to "submit an amended report."

16  (MTE Rubin Resp. at 1-2, n.2.)  At oral argument, the court ordered the parties to meet

17  and confer on an amended report.  (*See* 5/11/21 Min. Entry.)  After a meet and confer, the

18  parties resolved the disputes raised by Philips and request that the motion be withdrawn

19  as moot.  (Jt. Submission (Dkt. # 310) at 1-2.)  Accordingly, the court denies the motion

20  to exclude Dr. Rubin as moot.

21  //

22  //

# IV.    CONCLUSION

For the foregoing reasons, the court DENIES Summit's motion to exclude Drs. Sorini and Kennedy's testimonies (Dkt. ## 131 (sealed), 132 (redacted)), Philips's motion to exclude Mr. Grimes's testimony (Dkt. ## 142 (sealed), 146 (redacted)), and Philips's motion to exclude Dr. Rubin's testimony (Dkt. ## 143 (sealed), 148 (redacted)) as moot. The court GRANTS in part and DENIES in part Philips's motion to exclude Mr. Voth's testimony (Dkt. ## 144 (sealed), 149 (redacted)).

The court DIRECTS the Clerk to provisionally file this order under seal and ORDERS the parties to meet and confer regarding the need for redaction.  The court further ORDERS the parties to jointly file a statement within ten (10) days of the date of this order to indicate any need for redaction.

Dated this 14th day of May, 2021.

JAMES L. ROBART
United States District Judge